IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **TRAVELERS EXCESS AND SURPLUS LINES COMPANY, AS SUBROGEE AND ASSIGNEE OF CASTLE BUICK GMC, INC. D/B/A CASTLE CARS OF NAPERVILLE, LLC AND D/B/A CASTLE CHRYSLER DODGE JEEP RAM OF NAPERVILLE,** | § § § § § § § § | |
| | § | CASE NO. 1:25-cv-6699 |
| *Plaintiff,* | § § | JURY TRIAL DEMANDED |
| v. | § § | |
| **CDK GLOBAL, LLC,** | § § | |
| *Defendant.* | § § | |

## ORIGINAL COMPLAINT

Travelers Excess and Surplus Lines Company ("Travelers"), as Subrogee and Assignee of Castle Buick GMC, Inc.[1] d/b/a Castle Cars of Naperville, LLC and d/b/a Castle Chrysler Dodge Jeep Ram of Naperville (all referred to herein as "Castle"), files its Original Complaint against CDK Global, LLC ("CDK"), and respectfully shows the Court as follows:

## NATURE OF THE ACTION

1. This lawsuit involves the respective rights and obligations of the parties following two rapid-succession ransomware attacks conducted by a third-party against CDK, which resulted in damages and expenses to Castle.

2. CDK is a dominant player in technology for Dealer Management Systems, software systems used by dealerships in the automotive industry to conduct all aspects of their business.

---

[1] Castle Buick GMC, Inc., as the first-named insured, acts on behalf of and includes named insureds Castle Cars of Naperville, LLC, d/b/a Naperville Chrysler Dodge Jep Ram, Castle Cars of Schaumburg, LLC, d/b/a Castle Volkswagen, Castle Chevrolet, Inc., Castle Chevrolet North, LLC, Castle Buick GMC, Inc., Castle Cars of Chesterton, LLC, d/b/a Castle Chrysler Dodge Jeep Ram, Castle Imports, LLC d/b/a, Castle Subaru, and Castle Ford-Lincoln, Inc.

Castle was injured and suffered damages and expenses when CDK, without warning, cut off Castle's access to software and to Castle's own dealer-specific data that Castle relies upon for its operations. Travelers has paid $839,551.50 in indemnity payments to Castle for Castle's insured loss, and Castle has also sustained additional uninsured loss, for all of which Travelers (as subrogee and assignee of Castle) now sues CDK.

## PARTIES

3.     Travelers is a Connecticut company with its principal place of business at 1 Tower Square, Hartford, Connecticut 06183.  It is a citizen of Connecticut, but it is not a citizen of Delaware or Illinois.  Pursuant to a cyber insurance policy, Travelers has paid $839,551.50 in indemnity payments to Castle for Castle's insured loss and is subrogated to Castle's rights and claims to the extent of that payment. Castle also assigned to Travelers additional (and uninsured) amounts, rights, and claims against CDK arising from the matters set forth herein.

4.     CDK is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 1950 Hassell Road, Hoffman Estates, Illinois 60169.  Analysis of CDK's membership demonstrates that CDK is a citizen of Delaware and Illinois, but not a citizen of Connecticut:

      a. CDK's sole member is CDK Global Holdings II, LLC, a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 1950 Hassell Road, Hoffman Estates, Illinois 60169.

      b. CDK Global Holdings II, LLC's sole member is CDK Global Holdings, Inc., a corporation that is incorporated in the State of Delaware with its principal place of business located at 1950 Hassell Road, Hoffman Estates, Illinois 60169.

c. Because CDK Global Holdings II, LLC's sole member is a citizen of Delaware and Illinois, CDK Global Holdings II, LLC is a citizen of Delaware and Illinois, but is not a citizen of Connecticut.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. There is complete diversity between the parties, and the facts set forth herein demonstrate that the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because CDK resides and conducts business in, and a substantial part of the events giving rise to this dispute occurred in, the Northern District of Illinois. Venue is also proper pursuant to a contractual provision drafted by CDK, specifying suits will be filed in the Northern District of Illinois.

## FACTUAL BACKGROUND

7. Castle is an automobile dealership group that relies upon CDK to provide its Dealer Management System, an integrated software package including dealer-specific data, upon which Castle relies for its dealership operations and essential functions such as sales, service, repairs, and warranties (the "software system").

8. CDK describes its business as technology solutions in automotive retail, and it boasts having 50 years of experience and more than 15,000 retail location clients. CDK is the largest and most influential technology and software company in the automobile-dealership industry. Its position and dominance in the industry are vast, with its technology reportedly facilitating 2.6% of the United States' GDP.[2]

---

[2] Megan Cerullo, *CDK Global Cyber Attack Leaves Thousands of Car Dealerships Spinning Their Wheels*, CBS News (June 24, 2024), https://www.cbsnews.com/amp/news/cdk-cyber-attack-outage-update-2024).

9. Beginning on June 19, 2024, CDK abruptly cut off the industry's (and Castle's) access to that technology, including individual software systems for dealerships, grinding operations for thousands of automotive dealerships to a halt.

10. CDK (according to media reports, since CDK has failed to provide a full explanation even now) experienced a catastrophic-level cyberattack on its own computer systems and/or servers and/or components (all referred to herein for simplicity as CDK's "computer system") that caused CDK to take further actions that caused injury and damages to Castle and the industry at large. The cyberattack against CDK could not have come as a surprise to it, given its market share and domination in the technology space.

11. CDK had repeatedly emphasized the critical nature of safeguarding all computer systems, data, and technology in its annual reports of the dealership industry, where it warned that cybercriminals continue to target and attack the dealership industry, and that dealerships must assess and reassess security.[3] But it was CDK itself that had inadequate security and/or protocols.

12. CDK was aware of its own need for cyber resiliency in its technology operations, because cyberattacks are prolific, and industry standards require CDK to have segmented backup and disaster recovery programs to enable it to quickly restore operations if it suffers a cyberattack. CDK did not have proper cyber resilience, and that critical failure by CDK caused damage to Castle.

13. CDK's failures to implement reasonable security on its own computer system (which supports and provides access to the software system) and CDK's failures to train and supervise employees with access to and responsibility for its computer system resulted in two

---

[3] CDK Global, *The State of Dealership Cybersecurity 2023*; https://www.cdkglobal.com/insights/2023-state-cybersecurity-dealership-study.

separate cyberattacks, purportedly carried out by an outside party (and sometimes described as ransomware events).

14. During and after the ransomware events, CDK decided to take action to shut down Castle's access to the software system, thereby disrupting the entire business operations of Castle, as well as thousands of other dealerships and businesses that rely upon CDK's computer system for their operations (the "Cyber Incident"). CDK's termination of access to software systems (including the critical dealer-specific data incorporated with the systems) caused a massive disruption in workflow across the U.S. automobile industry.

15. To be clear, it was not a failure of cybersecurity by Castle that caused this damage. The cause of the damage was CDK's own failures, including its lack of cyber resiliency. CDK was responsible for the safety and security of its own vast computer system, including the way that computer system is connected to and/or supports various software systems and dealer-specific data of its customers, including Castle. CDK had a duty to ensure that its operations included reasonable security for its own computer system. CDK had a duty to remedy any flaws within its own computer system, as well as a duty to integrate and employ adequate and appropriate backups, incident response, and disaster recovery programs.

16. CDK promoted and emphasized the benefits of its technology business and the software system, as well as CDK's accompanying security and safety, to Castle and others, and Castle was aware of and relied upon CDK's statements, promotions, and carefully-curated profile. These communications, which appear to have been inaccurate in terms of the true extent of the safety and security of CDK's computer system and/or computer software, were provided for the guidance of Castle and others in their business transactions to induce them into relying upon CDK and its technology and computer system, which included support for the software system.

17. CDK describes itself as a technology company that thinks like dealers, with its focus on more customers, increased efficiency, reduced spend, and greater profitability. CDK is effective in marketing its own technology capabilities and computer system, including the way it can enable dealerships to access the software system, and is effective in convincing dealerships that use of CDK's technology is integral to their success.

18. Consistent with CDK's plan, Castle became fully dependent upon CDK to operate its dealership through use of the software system which incorporated and stored Castle's dealer-specific data. Without the CDK software system, Castle has no way to conduct its core functions involving sales, service, repairs, warranty and other operations, and no access to its pertinent data.

19. CDK entered into a written agreement with Castle to provide, among other things, the computer software with specifications consistent with Castle's needs to run its business operations, including its sales, service, parts, and warranty. That computer software worked in conjunction with Castle's dealer-specific data. Castle accessed the software and necessary data by logging into a computer system where the necessary components were available. Castle had to be allowed remote access to conduct its business, and it could not conduct its business functions without that access.

20. CDK, without advance notice and without adequate explanation, shut down Castle's access to the software system and Castle's own data on June 19, 2024.

21. CDK purposefully withheld more detailed information and explanations of what occurred, leaving Castle in the dark about what was happening and how long Castle would be unable to conduct its business. CDK's failure to share that information harmed Castle because Castle lacked the ability to make informed decisions about trying to minimize its losses, resulting in still more loss, damage, and expense to Castle.

22. CDK continued to withhold information for weeks following the shutdown, leaving Castle with no access to any information about its software system, no access to its dealer-specific data, and no information about its prospects for resuming operations. In fact, to date, CDK has refused to share information explaining how the third-party actor gained access to CDK's computer system which may have occurred, at least in part, due to CDK's own employees.

23. CDK did not restore Castle's access to aspects of the software system and access to data until various dates in July 2024. But even then, Castle lacked the ability to fully operate. Indeed, it took a substantial additional period of time beyond the initial "access date" for Castle to update necessary data within the software system and finally regain full system operations, and CDK provided no assistance with updating the necessary data.

24. During the period of shutdown, Castle was unable to conduct the regular business of its dealerships, including sales, service, parts, and warranty, and most other aspects of its business. As a direct result of CDK's failures to protect its own computer system, as well as its failure to provide access to Castle to the software system and dealer-specific data, Castle sustained both immediate and lasting damage to its operations and its business.

25. The shutdown was particularly surprising and damaging to Castle because CDK routinely publicizes the importance of focusing on cyber security and system security for dealerships. Substantial and centralized security is one of the ways that CDK markets its technology, approach, and offerings and convinces dealers to rely upon the software system.

26. CDK's failure to implement not just best practices, but industry standard adequate security measures for its own computer system, and by extension for access to the software system, contrary to CDK's promotion of its centralized security advantage, resulted in a lengthy shutdown

of access to the software system and data upon which Castle relies. While CDK preaches that "cybersecurity is a business priority," it is CDK's own failures that resulted in damage to Castle.

27. Given CDK's understanding of the dealership environment, CDK knew how dependent Castle was on the software system and knew or should have known the catastrophic impact any cyber incident at CDK would have on Castle. And CDK suffered not just one, but two, successful attacks against it and its own computer system in a short period of time according to reports published by third parties, further illustrating the inadequacy of both CDK's security and its incident response.

28. During this period of time, CDK exercised full control over Castle's dealer-specific data, including confidential business information about Castle and its operations and various personally identifiable information associated with operations. Castle had no access to its data, and no ability to rely upon or use that data for operations.

## CDK'S LIABILITY

29. CDK is a large and sophisticated organization with the resources to deploy the most robust cybersecurity protocols, and the resources and experience to train and supervise its employees to carry out all standard and expected safety and security measures. CDK knew, or should have known, that the development and use of such protocols, training, and supervision were necessary to fulfill its applicable duties to Castle. Thus, its failure to provide adequate security, and its failure to train and supervise its employees to perform their duties, is intentional, willful, reckless, and/or grossly negligent in this context.

30. CDK disregarded the rights of Castle and its obligations to Castle by intentionally, willfully, recklessly, negligently, or grossly negligently failing to take adequate and reasonable measures to ensure that CDK's own computer system was protected against unauthorized

intrusion; failing to disclose that it did not have adequate security protocols and training practices in place to appropriately safeguard its computer system and protect Castle's necessary access to the software system and Castle's own data; failing to take standard and reasonably available steps to prevent the Cyber Incident against CDK's own computer system; failing to have industry standard segmented backups and processes to quickly restore Castle's operations and Castle's access to its own data; concealing the existence and extent and expected duration of the Cyber Incident for an unreasonable time; failing to provide Castle prompt and accurate information regarding the reason for and continuing duration of the shutdown of access to the software system; and failing to provide viable operations to ensure the continuity of Castle's business operations.

31.     CDK's actions and failures to act, as well as its misrepresentations and/or omissions or failures to disclose information that it had a duty to disclose, are the direct and/or proximate cause of damage, loss, and injury to Castle.

32.     CDK's failure to provide information necessary for Castle to understand how long the Cyber Incident would impact its business hampered its ability to take mitigating measures to reduce its injury and damages and is a prime example of a dominant technology company's failure to act as a good business partner to Castle.

33.     As a result of CDK's ineffective and inadequate computer security practices, and its ineffective and inadequate training and supervision of its employees, the Cyber Incident against CDK's own computer system, and the foreseeable consequences of it, including but not limited to the injury and damage to Castle have materialized. Castle has suffered damages and expenses exceeding $839,551.50.

## **COUNT ONE – NEGLIGENCE AND GROSS NEGLIGENCE**

34. Castle incorporates herein by reference each of the allegations contained in the foregoing paragraphs, as though specifically alleged herein.

35. CDK engages in a highly specialized technology business, by and through its operation of its own computer system, to provide technology products or goods, including access to the critical software system and dealership-specific data that Castle relies upon for all aspects of its dealer operations.

36. CDK owed Castle a duty to act with reasonable care to secure and safeguard CDK's own computer system, and to establish redundancy protocols and backups, regarding CDK's computer system and technology, as well as regarding Castle's access to the software system and data at issue, and to use commercially reasonable methods to do so. CDK took on this obligation to the entire automotive industry by marketing and promoting CDK's ability to provide technology solutions and products (including by remote access) by causing its customers and third parties to become reliant upon its technology and hosting of data, and by representing that it would make the software system and data available.

37. CDK owed Castle a duty to ensure its own computer system and the software system including data maintained adequate security for the protection of Castle. CDK owed a duty to exercise reasonable control over its own computer system for the purpose of carrying out its business consistent with the heightened industry standards that exist. CDK owed a duty to exercise reasonable care in protecting Castle's access to the software system and data, and Castle's ability to operate the software system using its dealer-specific data. CDK owed a duty to provide adequate security, consistent with industry standards, to ensure that its own computer system and the software system would function and adequately protect all data and information. CDK owed a

duty of care to remedy any flaws or deficiencies within its own computer system without undue delay, and to employ segmented backups and disaster recovery programs to alleviate risks to Castle's access, software system, and data, and to allow Castle to maintain its operations.

38. CDK was aware of numerous, well-publicized cyber incidents and warned dealerships to be aware of the threats and ongoing incidents as well. CDK focused on and reported the potential hazards to those in the dealership industry and the fact that the dealership industry remained a high-priority and high-value target for cyber criminals.

39. CDK knew, or should have known, the risks inherent in operating its own computer system, making available the software system, and providing remote access to the software system for the purpose of carrying out its business, including the vulnerability to network attacks and the importance of adequate security against such attacks. CDK knew, or should have known, the injury and damage that would result to others if the CDK computer system had inadequate security, and therefore suffered a cyberattack, and failed to employ cyber resiliency practices, and therefore cause prolonged and unnecessary damage to others.

40. CDK knew or should have known that its own computer system and procedures did not adequately safeguard the technology, as well as the software system and/or Castle's access to the software system. Only CDK was in the position to ensure that its own computer system and protocols, and its backups and recovery programs, were sufficient.

41. CDK's failure to abide by its duties was wrongful, reckless, willful, negligent, and/or grossly negligent in light of the foreseeable risks and known threats to this industry. As an entity that exercises such an out-sized direct impact upon the automotive industry and its operations overall, CDK breached its duties to Castle (and the industry) in numerous ways, including but not limited to the following:

Failing to disclose and/or misrepresenting the true level and adequacy of the security for CDK's own computer system, including to induce Castle to rely upon CDK's processes as they impact the overall dealership industry;

Failing to disclose risks to security, including to induce Castle to rely upon CDK's processes as they impact the overall dealership industry;

Failing to exercise reasonable care and implement adequate security systems, protocols, training, and practices sufficient to protect CDK's own computer system;

Failing to comply with industry standard security measures for the industry leading up to the attacks against CDK's own computer system;

Failing to adequately monitor, evaluate, and ensure the security of its own computer network and computer system;

Failing to recognize in a timely manner that its own computer system and/or software system had been compromised;

Failing to timely and adequately disclose the extent of the compromise and extent of disruption to CDK's own computer system;

Failing to timely and adequately restore its own computer system;

Failing to employ segmented backups and disaster recovery programs to enable CDK to quickly restore operations;

Failing to timely and adequately keep Castle updated on restoration of access and omitting relevant information from communications to Castle.

42. As an entity that marketed to and induced Castle into doing business with CDK, CDK breached its duties to Castle in numerous ways, including but not limited to the following:

Failing to disclose and/or misrepresenting the true level and adequacy of the security for the software system and data, including to induce Castle to begin to use or continue to use the software system;

Failing to disclose risks to security of the software system and data, including to induce Castle to begin to use or continue to use the software system;

Failing to ensure that CDK implemented adequate security systems, protocols, training, and practices sufficient to protect the software system and Castle's access to its own data;

Failing to adequately monitor, evaluate, and ensure the security of the software system and data;

Failing to adequately protect the data (including but not limited to consistent with the Graham-Leach-Bliley Act and Safeguards Rule);

Failing to timely and adequately restore the software system and/or the access to the software system and data by Castle;

Failing to employ segmented backups and disaster recovery programs to enable CDK to quickly restore access to the software system and data by Castle;

Failing to timely and adequately keep Castle updated on restoration of access and omitting relevant information from communications to Castle.

43. Castle would not have lost access to its software system and data but for CDK's intentional, willful, reckless, negligent, and/or grossly negligent acts and omissions, and its breach of its duties. CDK's failure to take proper security measures to protect its own computer system, the software system, and Castle's access to the software system and data and business operations created conditions conducive to a complete shutdown of Castle's business. It was foreseeable that CDK's failure to provide adequate security, as well as timely and forthright notice and restoration, would result in substantial injury to Castle.

44. As a direct and proximate result of CDK's conduct, Castle has suffered damages and expenses, as well as economic and non-economic loss, including loss of sales, loss of service, repair, and warranty work, loss of customers and customer relations, damage to reputation, direct mitigation costs, and others, for which Castle seeks recovery.

## **COUNT TWO - NEGLIGENT TRAINING AND SUPERVISING**

45. Castle incorporates herein by reference each of the allegations contained in the foregoing paragraphs, as though specifically alleged herein.

46. CDK engages in its highly specialized technology business by and through operation of its own computer system, which system further supports and/or affords access to the critical software system and data that Castle relies upon for all aspects of its dealer operations.

CDK's own operations rely upon work by employees who must receive adequate training and supervision in the conduct of their work, including specifically the necessity to employ security measures that protect the CDK computer system, and the necessity to employ adequate measures to enable CDK to operate after a cyberattack occurs.

47. CDK owed Castle a duty to adequately train and supervise its employees that operate, support, access, and/or repair and remediate CDK's own computer system, which in turn supports the software system and data relied upon by Castle. CDK owed Castle a duty to properly and adequately train and supervise its employees in their inherent obligations to maintain, at all times, adequate security of the CDK computer system for the protection of Castle.

48. CDK knew, or should have known, that human error, including through negligence, is a primary cause of allowing intrusion by cyber criminals into a computer system. CDK knew, or should have known, that its employees were acting in ways that were dangerous or otherwise incompetent in the context of carrying out their responsibilities for ensuring computer safety and security.

49. CDK negligently trained and/or supervised its employees, including by failing to provide adequate information and oversight, which resulted in the Cyber Incident and apparent access to CDK's own computer system, thereby disrupting CDK's computer system's ability to function and causing CDK to cut off access by Castle.

50. The injury to Castle was a reasonably foreseeable consequence of CDK's negligent failure to train and supervise. CDK's negligence in training and/or supervision proximately caused injury and damage to Castle, for which Castle seeks recovery.

## **COUNT THREE - BREACH OF CONTRACT**

51. Castle incorporates herein by reference each of the allegations contained in the foregoing paragraphs, as though specifically alleged herein.

52. CDK markets itself to dealerships in the automotive industry, offering to enter into agreements to provide the critical software system and incorporated dealer-specific data that Castle relies upon for all aspects of its dealer operations.

53. CDK's software system is a unique type of good or product, designed to adequately support multi-store and/or multi-brand dealerships that have more complex DMS needs than smaller entities. CDK is one of very few technology companies that offer such a complex software system, with integrated data, and it is therefore a dominant party in the DMS industry.

54. In terms of any relationship with an individual dealership, CDK is indisputably the dominant party, and in that position it can dictate the terms of the relationship. CDK drafts written agreements with dealerships that are one-sided, benefitting CDK in all aspects of the relationship—in other words, to do business with CDK, Castle was at the mercy of CDK.

55. In its dealings with CDK, Castle did not draft the written agreement that CDK requires, and it had no real bargaining power regarding the key terms. Castle was required to sign an agreement that protected CDK, largely at the expense of Castle, in order to access the necessary software system. Castle experienced an absence of meaningful choice regarding key contract terms, including the contract's draconian remedy provisions and damages limitations.

56. In this context, CDK took advantage of its position of dominance against Castle, requiring Castle to sign a contract with unreasonable and unconscionable terms. A dealership like Castle must utilize a complex system like the software system in order to operate, and it has no choice but to submit to the contractual demands of CDK.

57. CDK entered into its agreement to provide the software system to Castle, and to afford Castle access to the software system and access to Castle's own data for the purpose of conducting Castle's dealership business.

58. As a part of that agreement CDK obtained possession of, maintained, and controlled access to Castle's own dealer-specific data that was necessary for Castle's operations.

59. CDK agreed to protect that data, and to afford Castle access to that data as a part of the operations of the software system. CDK undertook obligations to prevent improper access to the data, as well as to prevent loss and alteration of the data. CDK also undertook obligations to protect and/or was required to protect the confidentiality of the data, and to safeguard the data, consistent with Title V of the Graham-Leach-Bliley Act (the "Safeguards Rule").

60. In the relationship, there was unequal bargaining power, as well as a lack of reasonably available alternatives for a necessary software system with dealer-specific data.

61. In connection with the agreement, CDK was obligated to and promised to provide Castle with the necessary access to the software system and dealership-related data, as the essence of that agreement. That good or product, especially with its incorporation of Castle's data, was particular to Castle and was necessary for Castle's business operations.

62. As a result of and following the Cyber Incident, CDK decided not to provide the necessary access to the software system and data to Castle, and as a result, the agreement and its stated exclusive remedies wholly and completely failed for their essential purpose, leaving Castle without adequate recourse.

63. As a result of CDK's voluntary decisions and affirmative actions, Castle had no access to the software system and incorporated data, and therefore no ability to operate its business for an extended period of time. Not only did Castle lack access to its software system technology,

Castle had no way to access dealership-specific data and information upon which it had to rely to fashion an alternative business setup. Castle was forced to watch while its customers sought out competitor dealerships (not reliant upon CDK) to conduct business including sales, service, repairs, and warranty work.

64. As a result of CDK's failure to provide access to the software system, and CDK's failure to provide ongoing access to the dealer-specific data, Castle sustained various damages, costs, expenses, and loss, for which CDK is liable.

65. As a result of CDK's purposeful withholding of detailed information about what occurred and how long CDK would prevent access, Castle sustained additional damages, costs, expenses, and loss for which CDK is liable, because Castle lacked the ability to make informed decisions about minimizing its losses.

66. Further, as a result of CDK's conduct, acts, and omissions, any purported and exclusive limitation of remedy and/or limitation of damage categories and/or limitations on damage amounts which CDK may assert are applicable to these disputes, claims, and losses fail for their essential purpose and are wholly unenforceable against Castle. CDK's conduct, acts, and omissions caused the essential purpose of the agreement (to afford access to the software system and data) to fail, thus entitling Castle to recover its damages, losses, and expenses, pursuant to applicable common law and/or the Uniform Commercial Code, as adopted.

67. Further, the terms of any purported limitation of liability, limitations of remedy, and/or limitations of damage categories or amounts which CDK may assert apply to these disputes, claims, and losses are unconscionable, including under the facts and circumstances presented here, and therefore unenforceable against Castle. Castle is entitled to recover its damages, losses, and expenses, pursuant to common law and/or the Uniform Commercial Code, as adopted.

68. Under the facts presented, enforcement of any alleged limits would be improvident, oppressive, and totally one-sided. CDK is not entitled to any one-sided and unreasonable protections as a result of its own wrongful conduct and failure to comply with its own duties and obligations, all of which were fully within the control of CDK.

### PRAYER FOR RELIEF

Wherefore, for the foregoing reasons, Travelers Excess and Surplus Lines Company, as Subrogee and Assignee of Castle Cars of Naperville, LLC d/b/a Castle Chrysler Dodge Jeep Ram of Naperville and d/b/a Castle Buick GMC, Inc., respectfully requests that the Court enter judgment in its favor, and award it:

A. actual, consequential, and compensatory damages;

B. punitive and/or exemplary damages;

C. pre-judgment and post-judgment interest;

D. reasonable attorneys' fees;

E. costs and expenses; and

F. such other and further relief that this Court may find just and equitable.

**JURY DEMAND**

Plaintiff demands trial by jury.

        Respectfully submitted,

        TRAVELERS EXCESS AND SURPLUS LINES COMPANY, AS SUBROGEE AND ASSIGNEE OF CASTLE BUICK GMC, INC. D/B/A CASTLE CARS OF NAPERVILLE, LLC AND D/B/A CASTLE CHRYSLER DODGE JEEP RAM OF NAPERVILLE

By:   /s/ *Peter T. Berk*
      Peter T. Berk (ARDC No. 6242515)
      Clark Hill PLC
      130 E. Randolph Street, Suite 3900
      Chicago, IL 60601
      Telephone: (312) 985-5900
      Facsimile: (312) 985-5999
      pberk@clarkhill.com

      Toni Scott Reed*
      (Texas State Bar No. 00788376)
      Clark Hill PLC
      901 Main Street, Suite 6000
      Dallas, TX 75202
      Telephone: (214) 651-4345
      Facsimile: (214) 659-4091
      TSReed@clarkhill.com

      * *Pro Hac Vice Application forthcoming*

      *Counsel for Plaintiff Travelers Excess and Surplus Lines Company, as Subrogee and Assignee of Castle Buick GMC, Inc. d/b/a Castle Cars of Naperville, LLC and d/b/a Castle Chrysler Dodge Jeep Ram of Naperville*